1  Stephen C. McArthur (State Bar No. 277712)
   stephen@smcarthurlaw.com
2  Thomas E. Dietrich (State Bar No. 254282)
   tom@smcarthurlaw.com
3  THE MCARTHUR LAW FIRM, PC
   11400 W. Olympic Blvd. Suite 200
4  Los Angeles, CA 90064
   Telephone: (323) 639-4455
5
   *Attorney for Plaintiff Covves, LLC*
6

7              UNITED STATES DISTRICT COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9

10  COVVES, LLC,                          Case No. 2:18-CV-8518-RGK-AFM

11              Plaintiff,                 **DECLARATION OF THOMAS
                                           DIETRICH IN SUPPORT OF
12          v.                             PLAINTIFF'S MOTIONS IN
                                           LIMINE**
13  DILLARD'S, INC. a
    Delaware Corporation;                  **Hearing Date**: January 14, 2020
14  KOHL'S CORPORATION,                    **Time**: 9:00 a.m.
    a Wisconsin Corporation;               **Courtroom**: 850, 255 E. Temple St.,
15  SAKS & COMPANY LLC,                    Los Angeles, CA 90012
    a Delaware Corporation;
16  TARGET BRANDS, INC. a
    Minnesota Corporation;
17  EXPRESS, INC., a
    Delaware Corporation;
18  TILLY'S, INC. a Delaware
    Corporation;
19  NORDSTROM, INC., a Washington
    Corporation;
20  WEST MARINE, INC., a Delaware
    Corporation,
21  and
    ZULILY, INC. a
22  Delaware Corporation.

23              Defendants.

24

25

26

27

28

I, THOMAS DIETRICH, declare as follows:

1.      I am an attorney with The McArthur Law Firm, P.C., counsel for Plaintiff Covves, LLC ("Covves"), and I am admitted into practice before the State of California and this Court. I make this Declaration in support of Plaintiff's Motions in Limine (the "Motions"). The matters set forth herein are of my own personal knowledge, unless otherwise stated on information and belief, and if called upon to testify as to such matters, I could and would do so.

2.      I met and conferred telephonically with Morgan Nickerson, counsel for Defendants, on the issues raised in the Motions on November 21, 2019. The parties were unable to reach agreement on these issues.

3.      In April 2019, Covves served Defendants with (a) requests for production seeking all documents relating to costs Defendants incurred in relation to sales of accused products, and (b) interrogatories requesting a complete breakdown of such costs, the type of cost incurred, and an identification of all documents relating to such costs. Defendants responded to the requests for production by producing sales data spreadsheets that were made specifically for the litigation and either lacked cost information altogether or lacked any explanation of how claimed costs were calculated. Defendants uniformly objected to the interrogatory on cost information and directed Covves to the sales data spreadsheets.

4.      Attached as <u>Attachment 1</u> is a true and correct copy of an excerpt of the transcript of the Rule 30(b)(6) deposition of Target. The deponent was unable to answer any questions about how costs were calculated, what data was involved in the calculation, or who did those calculations. The deponent could only read the numbers on the sales data spreadsheet produced by Target.

5.      Due in part to this failure to provide relevant documents and information, Covves moved to compel Defendants to produce actual business records concerning, and a detailed breakdown of, revenues and profits from sales of

DECLARATION OF THOMAS DIETRICH
Case No. 2:18-cv-8518-RGK-AFM

accused products. The Magistrate Judge granted that motion. [Dkt. 102]

6.     Defendants Kohl's, Saks & Company, Tilly's, West Marine, Express, Nordstrom, and Zulily have not disputed that total profits consist of revenue minus cost of goods sold. None of these Defendants sought deductions of any other expenses.

7.     Following the Court's order, Target and Dillard's produced only the same made-for-litigation spreadsheets they had previously produced, updated to July 2019. They did not produce any actual business records to support the claimed costs and calculations thereof. To date, other than short spreadsheets showing claimed costs without any further explanation of the computations, Defendants have not produced a single actual business record used to support any of their computations of claimed deductible costs.

8.     Defendant Target attempted to deduct all of the following from gross profits: taxes for each fiscal year; store, headquarter, and distribution fixed overhead costs; Target's costs from incentives, bonuses, legal affairs, and something called "Shipt SG&A expenses" (which are not explained further). While the sales data spreadsheet Target has produced contains numbers for each of these claimed expenses, Target did not produce a single business record to support those computations or to explain how the expenses had a nexus to the accused products. Attached as Attachment 2 is a true and correct copy of Target's certification regarding revenues containing its identification of claimed deductible expenses, without any further explanation.

9.     Defendant Dillard's attempted to deduct operating expenses, depreciation, rentals, and interest/debt expenses from gross profits. Dillard's did not produce a single business record to support any of these deductions or its calculations thereof. Attached as Attachment 3 is a true and correct copy of Dillard's certification regarding revenues containing its identified expenses, without any further explanation.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on November 27, 2019.

3

4                          */s/ Thomas Dietrich*
                           Thomas Dietrich
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **Attachment 1**

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3    _____
 4    COVVES, LLC,                  Case:  2:18-cv-8518-GJS
 5    Plaintiff,
 6    v.
 7    DILLARD'S, INC., a
      Delaware Corporation;
 8    KOHL'S CORPORATION,
      a Wisconsin Corporation;
 9    SAKS & COMPANY, LLC,
      a Delaware Corporation;
10    TARGET BRANDS, INC., a
      Minnesota Corporation;
11    EXPRESS, INC., a
      Delaware Corporation;
12    TILLY'S, INC., a Delaware
      Corporation;
13    NORDSTROM, INC., a Washington
      Corporation;
14    WEST MARINE, INC., a Delaware
      Corporation,
15    and
      ZULILY, INC., a
16    Delaware Corporation,
17    Defendants.
18    _____
19              30(b)(6) DEPOSITION OF
20          TARGET BRANDS, INC./MEGAN HOFFMANN
21          Taken Wednesday, August 28, 2019
22              Scheduled for 9:30 a.m.
23
24    REPORTED BY:  DANA S. ANDERSON-LINNELL
25    PAGES 1 - 210
```

Page 1

1 30(b)(6) DEPOSITION OF TARGET BRANDS, INC./MEGAN

2 HOFFMANN taken on Wednesday, August 28, 2019,

3 commencing at 9:26 a.m., at the law offices of Faegre

4 Baker Daniels, 90 South Seventh Street, Suite 2200,

5 Minnesota, before Dana S. Anderson-Linnell, a Notary

6 Public of and for the State of Minnesota.

7               ***************

8

9               APPEARANCES

10

11 On Behalf of the Plaintiff:

12 Tom Dietrich, Esquire

13 THE MCARTHUR LAW FIRM, PC

14 11400 W. Olympic Boulevard, Suite 200

15 Los Angeles, CA 90064

16 Phone:  323.639.4455

17 Email:  tom@smcarthurlaw.com

18

19 (Appearances continued on next page.)

20

21

22

23

24

25

1 INDEX                              PAGE

2

3 WITNESS:  Megan Hoffmann

4 EXAMINATION BY:

5 Mr. Dietrich                        9

6 Mr. Nickerson                     207

7 Mr. Dietrich                      207

8

9 INSTRUCTIONS NOT TO ANSWER: 201

10

11 PRODUCTION REQUESTS:  (None.)

12

13 INDEX OF EXHIBITS:

14

15 Exhibit 1 - Plaintiff Covves, LLC's Notice

16 of Rule 30(b)(6) Deposition to Defendant

17 Target Brands, Inc.                 11

18

19 Exhibit 2 - CONFIDENTIAL Read It and Sweep

20 Policy, Bates TRGT-005451 to 452        29

21

22 Exhibit 3 - Target Brands, Inc.'s Response

23 to Plaintiff Covves, LLC's First Set of

24 Interrogatories                     46

25

1 APPEARANCES (continued):

2

3 On Behalf of Target Brands, Inc. and the Witness:

4 Morgan T. Nickerson, Esquire

5 K&L GATES, LLP

6 State Street Financial Center

7 One Lincoln Street

8 Boston, MA 02111-2950

9 Phone:  617.261.3100

10 Email:  morgan.nickerson@klgates.com

11

12 ALSO PRESENT:  Sonya Seidl, Target (partial day)

13

14 NOTE:  The original transcript will be filed with The

15 McArthur Law Firm, pursuant to the applicable Rules

16 of Civil Procedure.

17

18

19

20

21

22

23

24

25

1 INDEX OF EXHIBITS (continued):         PAGE

2

3 Exhibit 4 - Photocopy of picture of

4 inflatables                        63

5

6 Exhibit 5 - CONFIDENTIAL Email,

7 Bates TRGT-005453                   70

8

9 Exhibit 6 - CONFIDENTIAL Email,

10 Bates TRGT-002806                  74

11

12 Exhibit 7 - CONFIDENTIAL Email,

13 Bates TRGT-002802                  85

14

15 Exhibit 8 - CONFIDENTIAL Email chain,

16 Bates TRGT-002933 to 934             87

17

18 Exhibit 9 - CONFIDENTIAL Email and

19 attachment, Bates TRGT-003541 to 548    91

20

21 Exhibit 10 - CONFIDENTIAL Email,

22 Bates TRGT-003090                  101

23

24

25

Veritext Legal Solutions
866 299-5127

INDEX OF EXHIBITS (continued):              PAGE

Exhibit 11 - CONFIDENTIAL Email chain,
Bates TRGT-003000 to 002                106

Exhibit 12 - CONFIDENTIAL Email chain,
Bates TRGT-002926 to 927                109

Exhibit 13 - CONFIDENTIAL Email chain,
Bates TRGT-004355 to 359                113

Exhibit 14 - Photocopy of picture of
Sun Squad inflatable                    118

Exhibit 15 - Photocopy of picture of
Sun Squad inflatable                    119

Exhibit 16 - CONFIDENTIAL Email and
attachment, Bates TRGT-002807 to 810         120

Exhibit 17 - Item Profitability
Description of Key Terms                 127

Page 6

INDEX OF EXHIBITS (continued):              PAGE

Exhibit 25 - CONFIDENTIAL Email and
attached License and Supply Agreement,
Bates TRGT-002902 to 917                187

Exhibit 26 - CONFIDENTIAL Email and
attached Addendum to Partners Online,
Bates TRGT-003280 to 286                189

Exhibit 27 - CONFIDENTIAL Email chain,
Bates TRGT-003958 to 960                195

(Original exhibits attached to original transcript;
copies to counsel as requested.)

Page 8

INDEX OF EXHIBITS (continued):              PAGE

Exhibit 18 - CONFIDENTIAL Email chain,
Bates TRGT-003819 to 822                153

Exhibit 19 - Photocopy of picture of
inflatable                              157

Exhibit 20 - CONFIDENTIAL Email chain,
Bates TRGT-003871 to 874                162

Exhibit 21 - CONFIDENTIAL Email chain,
Bates TRGT-005284 to 285                166

Exhibit 22 - CONFIDENTIAL - Attorney's Eyes
Only Email chain, Bates TRGT-002440 to 441   169

Exhibit 23 - CONFIDENTIAL Email chain,
Bates TRGT-005425                       174

Exhibit 24 - Conditions of Contract         182

Page 7

```
 1              MEGAN HOFFMANN,
 2    called as a witness, being previously sworn,
 3        was examined and testified as follows:
 4              EXAMINATION
 5    BY MR. DIETRICH:
 6    Q.   Good morning.  Could you please state your
 7    full name for the record.
 8    A.   Megan Paige Hoffmann.
 9    Q.   My name is Tom Dietrich.  I'm an attorney
10    for Covves, LLC.  This is the court reporter,
11    Dana, you've met her.  Have you ever had your
12    deposition taken before?
13    A.   Yes.
14    Q.   How many times?
15    A.   Twice.
16    Q.   How long ago?
17    A.   Several years ago.
18    Q.   What kind of cases did that involve?
19    A.   One was a sexual harassment case.  And the
20    other was about setting -- trying to determine
21    who the legal entity of a certain company was.
22    Q.   Did both of those cases involve Target?
23    A.   Not directly.
24    Q.   I guess I'm just going to give you the
25    ground rules for a deposition again.  It's been
```

Page 9

3 (Pages 6 - 9)

1   Q.  Do you know if the pricing for the floats
2   is going to change in 2020?
3   A.  I don't know.
4   Q.  Do you know if Target's advertising
5   strategy as to the floats will change in 2020?
6   A.  No.
7   Q.  It won't?
8   A.  I don't know.
9   Q.  Alton left BigMouth at some point, is that
10  right?
11  A.  Yes.
12  Q.  Do you know why he left?
13  A.  I don't.
14  Q.  Did he reach out to you after he left?
15  A.  Yes.
16  Q.  And why did he reach out to you?
17  A.  Just saying that he had left BigMouth,
18  enjoyed working with me.  That's all I recall.
19  Q.  Did he mention why he left BigMouth?
20  A.  No.
21  Q.  Who was your primary contact after he left
22  BigMouth?
23  A.  I have not really had one, but we've been
24  working the most with Max.
25  Q.  What's Max's last name?

Page 126

1   A.  Wunderle.
2   Q.  Have you had any communications with Max
3   about this case?
4   A.  No.
5   Q.  How about about Covves?
6   A.  No.
7       (Exhibit Number 17 marked for
8   identification.)
9   BY MR. DIETRICH:
10  Q.  Showing you Exhibit 17.  Do you recognize
11  it?
12  A.  (Views document.)  Yes.
13  Q.  What is this?
14  A.  The Item Profitability Description of Key
15  Terms.
16  Q.  And what's the document as a whole?
17  A.  It has financial information related to
18  unicorn floats from BigMouth.
19  Q.  Who created this document?
20  A.  Target.
21  Q.  Who at Target?
22  A.  I believe Missy.
23  Q.  Did you talk to Missy about this document?
24  A.  No.
25  Q.  Did you review this document?

Page 127

1   A.  Yes.
2   Q.  Was this document created specifically for
3   this case?
4   A.  I believe so.
5   Q.  Top row of the box on the first page
6   refers to the data source for sales numbers
7   coming from the Vendor Profitability
8   Measurement or VPM.
9       Do you see that?
10  A.  Yes.
11  Q.  What's VPM?
12  A.  Vendor Profitability Measurement.
13  Q.  And what is that?
14  A.  I don't know.
15  Q.  Is that a Target system?
16  A.  I would guess so.
17  Q.  Do you know who obtained the information
18  from that system for this chart?
19  A.  Missy.
20  Q.  Do you know that, or are you just
21  guessing?
22  A.  I'm guessing.
23  Q.  And you don't know what system that is?
24  A.  I don't.
25  Q.  Do you have any knowledge about the data

Page 128

1   that's in that system?
2   A.  Sorry.  What?
3   Q.  Do you have any knowledge about the data
4   that's kept in that system?
5   A.  No.
6   Q.  Or how that data is entered?
7   A.  No.
8   Q.  Or how that data is obtained?
9   A.  No.
10  Q.  Under -- couple rows down, Average Sales
11  Price, it states Data Source, Calculation.
12  What calculation?
13  A.  I don't know.
14  Q.  Who did the calculation?
15  A.  I don't know.
16  Q.  Do you know what that calculation's based
17  on?
18  A.  No.
19  Q.  Have you done anything to investigate the
20  information in this chart for this deposition?
21  A.  No.
22      MR. NICKERSON:  Objection to form on
23  that last one.
24  BY MR. DIETRICH:
25  Q.  Under the -- there's columns for fixed

Page 129

33 (Pages 126 - 129)

| | |
|---|---|
| 1 overhead.  And it states allocated as a percent | 1   Q.   Do you know why not? |
| 2 of sales from the data source. | 2   A.   No. |
| 3     Do you see that? | 3   Q.   What does this chart on the second page |
| 4 A.  Yes. | 4 show? |
| 5 Q.  Do you know how these overhead costs are | 5   A.   It shows store item profitability detail. |
| 6 allocated? | 6   Q.   And that's for the 2017 fiscal year? |
| 7 A.  No. | 7   A.   Yes. |
| 8 Q.  What percent of sales is allocated to | 8   Q.   And if I read this correctly, there were |
| 9 overhead costs? | 9 $6,299 in sales of these unicorn floats in |
| 10 A.  No.  I do not know the percent. | 10 2017, is that right? |
| 11 Q.  Do you know how these calculations were | 11   A.   Yes. |
| 12 done? | 12   Q.   Does that indicate that you hadn't sold |
| 13 A.  No. | 13 them throughout the entire year? |
| 14 Q.  And do you know who did these calculations | 14   A.   Yes. |
| 15 for this chart? | 15   Q.   When was the date of first sale? |
| 16 A.  No. | 16   A.   I don't know. |
| 17 Q.  Under Income Taxes, the data source is | 17   Q.   You can't tell from this chart, can you? |
| 18 Calculation.  I just have to ask again:  Do you | 18   A.   No. |
| 19 know who did the calculation as to income | 19   Q.   Do you know when the date of first sale of |
| 20 taxes? | 20 any of these products was? |
| 21     MR. NICKERSON:  Objection to form. | 21   A.   No. |
| 22 It assumes that someone did it. | 22   Q.   Do you know why Target referred to this |
| 23     You can answer. | 23 chart in its interrogatory responses as to how |
| 24     THE WITNESS:  No. | 24 to find the date of first sale? |
| 25     MR. NICKERSON:  My objection is -- | 25     MR. NICKERSON:  Objection. |
| Page 130 | Page 132 |

| | |
|---|---|
| 1 because you look confused, my objection is the | 1     THE WITNESS:  Does that mean -- |
| 2 question assumes that a person did it, where it | 2 BY MR. DIETRICH: |
| 3 could have been an Excel formula.  That's the | 3   Q.   You can still answer. |
| 4 objection. | 4     MR. NICKERSON:  You can answer.  I'm |
| 5     MR. DIETRICH:  Understood. | 5 sorry.  I'll let you know if you can't. |
| 6 BY MR. DIETRICH: | 6 BY MR. DIETRICH: |
| 7 Q.  It states there was a calculation of some | 7   Q.   Yeah, he'll say something else besides |
| 8 kind for the data source of income taxes, | 8 just "objection to form" if you can't answer. |
| 9 right?  It states there was a calculation done? | 9     Because the interrogatory responses refer |
| 10 A.  Yes. | 10 to this chart as to information for the dates |
| 11 Q.  And do you have any idea who or what did | 11 of first sale, but I don't see that here, and |
| 12 that calculation? | 12 you said it's not here, right? |
| 13 A.  No. | 13     MR. NICKERSON:  Objection. |
| 14 Q.  Do you have any idea what data was taken | 14     THE WITNESS:  No. |
| 15 into account in that calculation? | 15 BY MR. DIETRICH: |
| 16 A.  No. | 16   Q.   How would I find out when Target first |
| 17 Q.  Turning to the second page.  I see a | 17 sold the adult float? |
| 18 column -- rows for three floats, right? | 18   A.   I would pull sales by week. |
| 19 A.  Yes. | 19   Q.   You can do that? |
| 20 Q.  And that's the -- looks like what we've | 20   A.   I don't know because I don't use the VPM |
| 21 called the adult float, the little float and | 21 data source as a buyer. |
| 22 the beverage boats, correct? | 22   Q.   But you said that it's possible to pull |
| 23 A.  Yes. | 23 sales by week? |
| 24 Q.  The pride float's not on here, is it? | 24   A.   Yes.  I don't know if you can pull it |
| 25 A.  No. | 25 based on what our legal team uses, though. |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

1  Q.  But Target has that information?
2  A.  Yes.
3  Q.  And I could do the same for each of the
4  floats on this chart?
5  A.  Do each of what?
6  Q.  To pull sales by week to find out when
7  they were first sold.
8  A.  Yes.
9  Q.  Each of these floats is still being sold
10  today, right?
11  A.  Yes.
12  Q.  And Target has never stopped selling them
13  at any point?
14  A.  No.  And to clarify, we have stopped
15  selling these.
16  Q.  You have stopped selling these?
17  A.  At some point, yes.
18  Q.  When?
19  A.  At the end of the summer.
20  Q.  Which summer?
21  A.  At the end of every summer we exit out of
22  summer merchandise.
23  Q.  So how --
24  A.  And this is summer merchandise.
25  Q.  So let's take 2018.  When would that exit

Page 134

1  Q.  In what division?
2  A.  Sporting goods.
3  Q.  Does she work under you?
4  A.  No.
5  Q.  Do you see the numbers under Cost of Goods
6  Sold for the unicorn floats?
7  A.  Sorry?
8  Q.  Do you see the numbers for cost of goods
9  sold for the unicorn floats on this page?
10  A.  For the 2017 page?
11  Q.  Yes.
12  A.  Yes.
13  Q.  Where do those numbers come from?
14  A.  Comes from calculate -- oh, VPM.  Well,
15  cost of goods sold comes from calculation,
16  sales dollars, gross margin.
17  Q.  Do you know what that means?
18  A.  No.
19  Q.  Do you know how that calculation is done?
20  A.  No.
21  Q.  Do you know who calculated cost of goods
22  sold on this chart?
23        MR. NICKERSON:  Objection to form.
24        THE WITNESS:  No.
25  BY MR. DIETRICH:

Page 136

1  happen?
2  A.  It would start to mark down in August.
3  Q.  And then they would be sold out of stores?
4  A.  Yes.
5  Q.  And then it's the February of the next
6  year that they could come back into stores?
7  A.  Yes.
8  Q.  Okay.  Does Target sell a BigMouth snow
9  float shaped like a unicorn?
10  A.  I don't know.
11  Q.  Have you ever seen that product?
12  A.  I can't recall.
13  Q.  And when I say "snow float," it's an
14  inflatable unicorn-shaped thing used, I guess,
15  as a sled.  Do you know what I'm talking about?
16  A.  Yes.
17  Q.  Do you know if Target sells that?
18  A.  I don't know.
19  Q.  Who would know the answer to that
20  question?
21  A.  Alyssa Ramsey.
22  Q.  R-a-m-s-e-y?
23  A.  R-a-m-s-e-y.
24  Q.  And what's her position?
25  A.  She's an associate buyer.

Page 135

1  Q.  I'll rephrase that.  Do you know who or
2  what calculated cost of goods sold on this
3  chart?
4  A.  No.
5  Q.  And do you personally have any knowledge
6  about where these cost of goods sold numbers
7  came from?
8  A.  No.
9  Q.  And have you done any investigation on
10  that issue in preparation for the deposition
11  today?
12        MR. NICKERSON:  Objection to form.
13  By "investigation," are you including the time
14  spent prepping for the 30(b)(6) --
15        MR. DIETRICH:  Well --
16        MR. NICKERSON:  -- or independent
17  investigation?  Because I think that's where
18  we're crossing up.
19        MR. DIETRICH:  I understand.  And I
20  appreciate the clarification there.
21  BY MR. DIETRICH:
22  Q.  So you said that you met with Morgan and
23  other individuals yesterday, is that right?
24  A.  Yes.
25  Q.  In preparation for the deposition?

Page 137

35 (Pages 134 - 137)

1  A.  Yes.
2  Q.  How long was that meeting?
3  A.  Approximately -- several hours.
4  Approximately three or four.
5  Q.  And outside of that meeting, did you do
6  any other investigation to prepare for the
7  deposition?
8  A.  No.
9  Q.  So you didn't talk to anybody at Target
10  outside of that meeting yesterday?
11  A.  Correct.
12  Q.  You didn't review any other documents
13  outside of what you reviewed in the meeting
14  yesterday?
15  A.  Correct.
16  Q.  And just as far as the cost of goods sold
17  numbers on this chart, you don't know, other
18  than what's listed on the first page, where
19  those numbers came from?
20  A.  Correct.
21  Q.  And how about, say, the gross margin
22  numbers on this chart, do you know where those
23  came from?
24  A.  According to the document, VPM.
25  Q.  What's that?

Page 138

1  A.  Vendor Profitability Measurement.
2  Q.  Oh, VPM.  Okay.  We've talked about that.
3  You don't know what that is other than what's
4  listed here?
5  A.  Correct.
6  Q.  Does this chart indicate that Target lost
7  money on unicorn floats in 2017?
8  A.  What chart?
9  Q.  The chart on page 2.
10  A.  Yes.
11  Q.  Do you recall that Target lost money on
12  unicorn floats in 2017?
13  A.  No.
14  Q.  Going to the next page.  I see February
15  and January, but it doesn't have a year there.
16  Do you know what year this chart on page 3 is
17  for?
18  A.  It should be fiscal year 2018.
19  Q.  And that's February 2018 to January 2019?
20  A.  Correct.
21  Q.  So under this chart, Target sold 174,302
22  unicorn floats of the three listed here in
23  2018, is that right?
24       MR. NICKERSON:  Objection as to
25  form.

Page 139

1       THE WITNESS:  Yes.
2  BY MR. DIETRICH:
3  Q.  But the pride float is not on this list
4  either, is it?
5  A.  It's not on here.
6  Q.  What about the unicorn lake float, is it
7  on here?
8  A.  Can you be more specific?  Which lake
9  float?
10  Q.  Are there multiple unicorn lake floats?
11  A.  Depends on how you define "lake float."  I
12  mean, these are all lake floats.
13  Q.  A larger one for multiple people.
14  A.  Sorry.  What's the question?
15  Q.  Target sells a larger unicorn lake float,
16  I believe it's called, for multiple people,
17  right?
18  A.  Yes.
19  Q.  And that's not on this list?
20  A.  It wasn't sold in 2018.
21  Q.  But the pride float was sold in 2018?
22  A.  I don't know.
23  Q.  On the cost of goods sold -- I guess is
24  this the same as the chart we just looked at,
25  that you don't know where the cost of goods

Page 140

1  sold numbers come from other than what's listed
2  on the document?
3       MR. NICKERSON:  Objection,
4  mischaracterizes testimony.
5  BY MR. DIETRICH:
6  Q.  Do you know where the cost of goods sold
7  numbers came from?
8  A.  It came from the calculation that's listed
9  on the document, calculation, sales dollars,
10  gross margin.
11  Q.  Right.  And you said you don't know what
12  that means, right?
13  A.  Correct.
14  Q.  And you don't know who or what did that
15  calculation?
16  A.  Correct.
17  Q.  Do you know if these cost of goods sold
18  numbers are the actual amounts that Target paid
19  to BigMouth for the floats?
20       MR. NICKERSON:  Objection to form.
21       THE WITNESS:  I do not.
22  BY MR. DIETRICH:
23  Q.  Do you see the -- it says "Store FOH" on
24  the chart, but it says on the first page "Store
25  Fixed Overhead."

Page 141

36 (Pages 138 - 141)

1     MR. NICKERSON: You lost me on that
2  one. Can you tell me --
3     MR. DIETRICH: Yeah, I'm looking at
4  the Store Fixed Overhead column on the chart on
5  page 3. It's under Allocated Expenses.
6     MR. NICKERSON: I see Store FOH.
7     MR. DIETRICH: Right. And the first
8  page it says that it means store fixed
9  overhead.
10     MR. NICKERSON: All right. Go
11  ahead.
12  BY MR. DIETRICH:
13  Q.  Do you see that column?
14  A.  Yes.
15  Q.  And I see that the store fixed overhead
16  for the adult float is more than double the
17  fixed overhead for each of the other floats.
18     Do you see that?
19  A.  Yes.
20  Q.  Do you know why that is?
21  A.  No.
22  Q.  Do you know if there's a significant
23  difference in box size for, say, the adult
24  float versus the little float?
25  A.  It's not a significant difference in my

Page 142

1  opinion.
2  Q.  So do you have any idea why the store
3  fixed overhead might be so much higher for the
4  adult float than the little float?
5  A.  I do not, no.
6  Q.  And you see the sales units. There were
7  about 60,000 little floats sold and 69,000
8  adult floats sold.
9     Do you see that?
10  A.  Yes.
11  Q.  So the numbers aren't dramatically
12  different, but store fixed overhead is more
13  than double for the adult float, right?
14  A.  Yes.
15     MR. NICKERSON: Just to make a
16  record, if it helps you, it says, "Allocated as
17  a percent of sales" on the first page. So it's
18  just all based on sales numbers.
19     MR. DIETRICH: Right.
20  BY MR. DIETRICH:
21  Q.  But you don't have any idea how that
22  allocation was made for store fixed overhead,
23  is that right?
24  A.  Not other than what was stated on the
25  sheet, "Allocated as a percent of sales."

Page 143

1  Q.  How about the other fixed overhead
2  allocated expenses, do you have any idea how
3  those were calculated?
4  A.  I know based on what's stated on the first
5  sheet.
6  Q.  These floats were all sold on Target.com
7  too, right?
8  A.  Yes.
9  Q.  Does this chart do anything to break out
10  which ones were sold in stores and which ones
11  were sold online?
12  A.  Not that I see.
13  Q.  Do you know if online sales are included
14  in this chart?
15  A.  I don't know.
16  Q.  Do you have any indication whether they
17  are or aren't based on the numbers here?
18  A.  I don't. If it's pulled by vendor number,
19  it should pull all sales or all financial
20  metrics.
21  Q.  And that would -- when you say "pull all
22  sales," that would be online and store sales?
23  A.  Yes.
24  Q.  Target.com, if that's sold online, it's
25  not sold through retail stores, right?

Page 144

1  A.  No, not necessarily.
2  Q.  Well, if I ordered a unicorn float on
3  Target.com, where would it come from?
4  A.  It depends.
5  Q.  If I'm here in Minneapolis, where would it
6  come from?
7  A.  It depends.
8  Q.  Does it come from a warehouse?
9  A.  It might.
10  Q.  Where else might it come from?
11  A.  A store.
12  Q.  Can you describe that process?
13  A.  Yep. So we -- as a company we can fulfill
14  online orders from a store.
15  Q.  Or a warehouse?
16  A.  Yes.
17  Q.  Or any other location?
18  A.  A distribution center or a store.
19  Q.  Distribution center, is that the right
20  name? I'm calling them a warehouse.
21  A.  Yes.
22  Q.  A distribution center would have different
23  fixed overhead costs than a store, wouldn't it?
24  A.  I don't know.
25  Q.  Do you have any idea what the fixed

Page 145

37 (Pages 142 - 145)

| | |
|---|---|
| 1  overhead costs of a distribution center would | 1  sales data from 2019. |
| 2  be? | 2  Q.  And you said that Target is still selling |
| 3        MR. NICKERSON:  Objection to form. | 3  these floats, right? |
| 4  It's way outside the 30(b)(6). | 4        MR. NICKERSON:  Objection, |
| 5        If you happen to have personal | 5  mischaracterizes prior testimony. |
| 6  information on the fixed cost of a distribution | 6        You can answer. |
| 7  center, feel free to answer. | 7  BY MR. DIETRICH: |
| 8        MR. DIETRICH:  Well, I guess I'm | 8  Q.  Is Target still selling each of these |
| 9  just going to respond back to that.  I mean, | 9  floats? |
| 10  this is something that's included in this | 10  A.  Yes. |
| 11  chart, which doesn't do anything to break out | 11  Q.  And that is to date? |
| 12  online sales. | 12  A.  Is what to date? |
| 13        MR. NICKERSON:  It's not included in | 13  Q.  They're still selling them up to today? |
| 14  this chart.  There's no -- the question was: | 14  A.  Yes. |
| 15  Do you know the overhead on a distribution | 15  Q.  So this chart doesn't contain any of the |
| 16  center?  I mean, that is nowhere on this chart | 16  data for sales after March 2019, right? |
| 17  at all. | 17  A.  It looks that way. |
| 18        MR. DIETRICH:  Well, the fixed | 18  Q.  The pride float is not on this chart |
| 19  overhead numbers of each store, of HQ, these | 19  either, is it? |
| 20  are included here, and so that would be | 20  A.  No. |
| 21  something that goes directly to how those | 21  Q.  And that float was sold in 2019, wasn't |
| 22  numbers are calculated versus online sales and | 22  it? |
| 23  store sales. | 23  A.  I don't know. |
| 24        MR. NICKERSON:  I'll stand by the | 24  Q.  You don't know? |
| 25  objection that it's way outside the scope of | 25  A.  Correct.  I don't know. |
| *Page 146* | *Page 148* |

| | |
|---|---|
| 1  the 30(b)(6) notice. | 1  Q.  Have you looked into whether the pride |
| 2        If you happen to have personal | 2  float was sold in 2019? |
| 3  information, you can answer. | 3  A.  No. |
| 4  BY MR. DIETRICH: | 4  Q.  Have you done any sort of research |
| 5  Q.  I'm going to take it you don't know | 5  regarding the pride float? |
| 6  anything about the overhead costs of a | 6  A.  No. |
| 7  distribution center? | 7  Q.  You pointed out in Exhibit 4 that |
| 8        MR. NICKERSON:  Objection to form. | 8  the pride float -- I mean, you recognized it in the |
| 9        THE WITNESS:  I do not, no. | 9  exhibit, right? |
| 10  BY MR. DIETRICH: | 10  A.  Yes. |
| 11  Q.  But you'll agree with me there's no way to | 11  Q.  So you knew it was a unicorn-shaped pool |
| 12  tell how many of these items on this chart were | 12  float that came from BigMouth, right? |
| 13  sold online versus from a store. | 13  A.  Yes. |
| 14  A.  Correct. | 14  Q.  And you didn't do any kind of |
| 15  Q.  If you would turn to the last page.  This | 15  investigation about that float for this |
| 16  is the chart for what year? | 16  deposition today? |
| 17  A.  Fiscal year 2019. | 17  A.  Not outside of what Morgan and I discussed |
| 18  Q.  And it just says February and March. | 18  yesterday for prep. |
| 19        Do you see that? | 19  Q.  So you don't know when the pride float was |
| 20  A.  I do. | 20  sold by Target? |
| 21  Q.  So is this only for two months of 2019? | 21  A.  Correct. |
| 22  A.  I don't know.  It looks that way. | 22        MR. NICKERSON:  I'll object to that |
| 23  Q.  So you don't know what specifically this | 23  one because it assumes that it was sold. |
| 24  chart contains as far as date? | 24  BY MR. DIETRICH: |
| 25  A.  It looks like it's February and March | 25  Q.  Do you know if Target sold the pride float |
| *Page 147* | *Page 149* |

## Attachment 2

1   Caitlin C. Blanche
    (State Bar No. 254109)
2   caitlin.blanche@klgates.com
    **K&L GATES LLP**
3   1 Park Plaza, Twelfth Floor
    Irvine, CA 92614
4   Tel: (949) 623-3526
    Fax: (949) 253-0902
5
    Christopher Centurelli
6   Morgan Nickerson
    Jeffery S. Patterson
7   Natasha C. Pereira
    (Admitted *pro hac vice*)
8   **K&L Gates LLP**
    State Street Financial Center
9   One Lincoln Street
    Boston, MA  02111
10  Tel:  (617) 261-3100
    Fax:  (617) 261-3175
11
    *Attorneys for Defendants*
12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15
    COVVES, LLC,                    **Case No. 2:18-cv-08518-GJS**
16
              Plaintiff,            **CERTIFICATION OF REVENUE**
17
         v.
18
    DILLARD'S, INC. a Delaware
19  Corporation;
    KOHL'S CORPORATION, a
20  Wisconsin Corporation;
    SAKS & COMPANY LLC., a
21  Delaware Corporation;
    TARGET BRANDS, INC. a Minnesota
22  Corporation;
    EXPRESS INC., a Delaware
23  Corporation;
    TILLY'S, INC. a Delaware
24  Corporation;
    NORDSTROM, INC., a Washington
25  Corporation;
    WEST MARINE, INC., a Delaware
26  Corporation,
    and
27  ZULILY, INC. a Delaware
    Corporation.
28
              Defendants.

- 1 -

**CERTIFICATION OF REVENUE  CASE NO. 2:18-CV-08518**
303892978 v1

I, Erin Hagen, declare as follows:

1. I am employed at Target Brands, Inc. ("Target"). The below statements herein are based on my personal knowledge.

2. Exhibit A is a true and accurate copy of Target's sales data of the allegedly infringing products on a monthly or quarterly basis containing revenue, costs, profits as well as other relevant data.

3. I verify that Exhibit A is created in the regular course of Taregt's business reporting system.

4. I further confirm that Exhibit A is true, and accurate for the reported period.

5. The profit amounts provided in Exhibit A are calculated by taking revenue and subtracting out direct and allocated expenses and well as taxes.

6. I have provided a cover sheet that explains each of the costs taken out of revenue to arrive at profitability.  In short, the costs taken out include the direct cost of the product; store, headquarter, and distribution fixed overhead costs; Target's costs from incentives, bonuses, legal affairs, and Shipt SG&A expenses; and taxes.  The non-direct expenses are all allocated as a percent of sales.   As indicated in the report, a tax rate of 19.9% was used for FY2017 and a rate of 20.3% was used for FY2018-19.

   I declare that the foregoing declaration is to the best of my knowledge true and correct under the penalty of perjury and the laws of the United States of America.

- 2 -

**CERTIFICATION OF REVENUE   CASE NO. 2:18-CV-08518**
303892978 v1

CONFIDENTIAL                                                                                   TRGT-006401

1    Dated: 10/14/19                              By: _____
2                                                  Erin Hagen
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 3 -

**CERTIFICATION OF REVENUE   CASE NO. 2:18-CV-08518**
303892978 v1

CONFIDENTIAL                                                    TRGT-006402

# **Attachment 3**

Caitlin C. Blanche
(State Bar No. 254109)
caitlin.blanche@klgates.com
**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, CA 92614
Tel: (949) 623-3526
Fax: (949) 253-0902

Christopher Centurelli
Morgan Nickerson
Jeffery S. Patterson
Natasha C. Pereira
(Admitted *pro hac vice*)
**K&L Gates LLP**
State Street Financial Center
One Lincoln Street
Boston, MA  02111
Tel:  (617) 261-3100
Fax:  (617) 261-3175

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COVVES, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>DILLARD'S, INC. a Delaware Corporation;<br>KOHL'S CORPORATION, a Wisconsin Corporation;<br>SAKS & COMPANY LLC., a Delaware Corporation;<br>TARGET BRANDS, INC. a Minnesota Corporation;<br>EXPRESS INC., a Delaware Corporation;<br>TILLY'S, INC. a Delaware Corporation;<br>NORDSTROM, INC., a Washington Corporation;<br>WEST MARINE, INC., a Delaware Corporation,<br>and<br>ZULILY, INC. a Delaware Corporation.<br><br>        Defendants. | Case No. 2:18-cv-08518-GJS<br><br>**CERTIFICATION OF REVENUE BY DILLARD'S, INC.** |

- 1 -

**CERTIFICATION OF REVENUE BY DILLARD'S, INC.**                    **CASE NO. 2:18-CV-08518**

CONFIDENTIAL                                                    DILL-000218

I, Anita Spence, declare as follows:

1.  I am the Director of Vendor Relations at Dillard's, Inc. ("Dillard's"). The below statements herein are based on my personal knowledge.

2.  Exhibit A is a true and accurate copy of Dillard's sales data of the allegedly infringing products on a monthly or quarterly basis containing revenue, costs, profits as well as other relevant data.

3.  I verify that Exhibit A is created in the regular course of Dillard's business reporting system.

4.  I further confirm that Exhibit A is true, and accurate for the reported period.

5.  The profit amounts provided in Exhibit A are calculated as follows:

| | |
|---|---|
| Sales: | $19,917.26 |
| Cost of Goods Sold: | ($15,405.00) |
| Operating Expenses, Depreciation, Rentals and Interest/Debt Expenses: | ($6,377.51) |
| Net Profit: | ($1,865.25) |

I declare that the foregoing declaration is to the best of my knowledge true and correct under the penalty of perjury and the laws of the United States of America.

Dated: 10/14/2019

By: _Anita Spence_

_____

Anita Spence

- 2 -

CERTIFICATION OF REVENUE BY DILLARD'S, INC.                    CASE NO. 2:18-CV-08518

CONFIDENTIAL